UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

THE REYNOLDS & REYNOLDS
COMPANY,

        Plaintiff,

-v-

SUPERIOR INTEGRATED SOLUTIONS,
INC.,

        Defendant.

Case No. 1:12-cv-848

Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING REYNOLDS' MOTION TO DISMISS (Doc. #29) AND OVERRULING SIS's EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION (Doc. #28)**

---

Now before the Court is a Motion To Dismiss Defendant Superior Integrated Solutions, Inc.'s ("SIS's") Amended Counterclaims brought by Plaintiff Reynolds & Reynolds Company ("Reynolds"). (Doc. #29.) Reynolds seeks to dismiss SIS's Amended Counterclaims pursuant to Fed. R. Civ. P. 8 and 12(b)(6).

Count I of SIS's Amended Counterclaim is for tortious interference with contractual relationships. Count II is for violation of Section 1 of the Sherman Antitrust Act. Count III is for violation of Section 2 of the Sherman Antitrust Act and Count IV is for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq. In addition to damages for each Count, SIS seeks temporary and permanent injunctive relief.

Reynolds' Motion To Dismiss is now fully briefed and ripe for decision. A relevant factual background based upon SIS's Amended Counterclaim will first be set forth. This will be followed by the relevant legal provisions and an analysis of Reynolds' Motion.

## RELEVANT FACTUAL BACKGROUND

### The Parties

Reynolds is an Ohio Corporation with its principal place of business in Kettering, Ohio. (Am. Countercl. ¶ 2.) SIS is a New Jersey corporation with its principal place of business in Edison, New Jersey. (Id. at ¶ 1.)

Reynolds owns and operates a proprietary dealer management system ("DMS"). (Id. at ¶ 9.) Reynolds provides its DMS, called ERA,[1] through direct contracts with retail automotive dealers throughout the country. (Id. at ¶ 5.) "Reynolds is the largest provider of DMS to auto dealers… occupying a large percentage of the market." (Id.) Approximately 40% of the auto dealers served by SIS use Reynolds' ERA. (Id. at 22.)

SIS develops and provides software that integrates third-party applications with DMSs, including Reynolds ERA. (Id. ¶ 10.) SIS derives approximately 40% of its revenue by integrating third-party applications with ERA. (Id. at ¶ 23.)

### DMS

A DMS allows auto dealers to efficiently organize and utilize numerous types of information that is necessary to operate their business, such as customer information, inventory information and finance and insurance information. (Id. at ¶ 6.)  Other companies, sometimes referred to as third-party application providers, sell software and other technology products to dealerships that use the dealers' information that is kept on the dealers' DMS. (Id. at ¶ 7.)

When the dealerships use Reynolds' ERA, the software provided by the third-party application providers must be integrated with ERA in order to function in an optimal fashion.

---

[1]SIS's Amended Counterclaim refers to ERA as "Reynolds-brand DMS."

-2-

(Id. at ¶ 9.) SIS develops and provides integration software that allows this integration to occur. (Id. at 10.)

Reynolds also provides integration of third-party applications with its ERA. (Id. at ¶ 11.) In addition, Reynolds permits third parties, including third-party integrators, access to its ERA if the third-party is willing to become "Reynolds certified for an exorbitant fee."[2] (Id. at 12.)

### Reynolds' Agreements With ERA Customers

This Court may take notice of the contracts between Reynolds and its ERA customers referenced in SIS's Amended Counterclaim for purposes of this Motion To Dismiss because these contracts are mentioned in the Amended Counterclaim and are central to SIS's allegations. *See Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011).

Reynolds' auto-dealership customers agree to certain prohibitions on integration of third-party applications when the customers license Reynolds' ERA. (Reynolds Response To Emergency Motion (doc. # 30), Ex. A-2.) When they sign up for ERA, customers typically agree to prohibitions on connecting third-party applications to ERA. (Id.) The customers also agree to prohibitions on allowing third-party integrators that are not licensed by Reynolds, like SIS, to interface with ERA. (Id.) Finally, the customers agree to permit Reynolds to access the systems obtained from Reynolds and to access the auto dealer's business data. (Id.)

### Relationship Background

Reynolds is, according to SIS, restricting data access of third-party vendors offering services to the auto dealers to force the auto dealers to purchase similar products being offered

---

[2]To become certified, integrators enter into a Reynolds Interface Agreement ("RIA") with Reynolds.

by Reynolds. (Id. at 14.) Thus, according to SIS, Reynolds is, in effect, eliminating the purchase options of the auto dealers and preventing them from choosing the best available services. (Id. at 15.) Finally, according to SIS, Reynolds recently intensified its efforts to prevent auto dealers from using third-party vendor services, and is using information that Reynolds wrongfully acquired from the internal SIS support site to actively interfere with the interface between SIS's integration software and ERA that is on auto dealers' computers. (Id. at 19.)

All of SIS's business relationships depend on, among other things, SIS's ability to integrate its customers' software applications with SIS's customers' DMS. (Id. at 24.) Thus, "Reynolds current interference with the use of SIS's integration software is causing, and will continue to cause, SIS to lose its corporate goodwill in the marketplace…." (Id. at 25.) Finally, "the auto dealers have been led to believe that they cannot do business with SIS or third-party application providers, or that if they do their data security will be compromised." (Id. at 27.)

### Prior Litigation

Reynolds and SIS were parties to a lawsuit previously adjudicated in this Court, case no. 3:09-cv-314 (the "2009 Case").[3] Therein, in a Complaint filed on August 18, 2009, SIS claimed that Reynolds had begun terminating SIS's rights under an RIA and sought declaratory judgment, injunctive relief and damages for various alleged torts. (2009 Case, doc. #1.) The Court declined to enter a temporary restraining order or a preliminary injunction on September 23, 2009. (Doc. #26.) On October 12, 2009, the Court ordered Reynolds to place SIS's VOC

---

[3]Although not mentioned in SIS's Amended Counterclaim, the Court may take judicial notice of proceedings previously before it.

entries back into the appropriate VOC file[4] and to further refrain from removing any SIS code from dealer systems without dealer approval. (Doc. #37.) On October 13, 2009, Reynolds reported to the Court that it had moved the VOC entries back into the appropriate files and that it expects that the SIS integration product will remain disabled due to changes Reynolds made to its own ERA software code. (Doc. #38.) Reynolds and SIS resolved this lawsuit by entering into a stipulated settlement agreement, and agreed to dismissal of the lawsuit with prejudice. (Doc. #61.)

## Relevant Procedural Background

Reynolds filed its initial Complaint in this matter on November 1, 2012. (Doc. #1.) SIS answered on January 17, 2013. (Doc. #16.) Reynolds amended its Complaint on February 7, 2013, (doc. #22), and SIS amended its Counterclaim on February 29, 2013 (doc. #25).

Reynolds' initial Motion To Dismiss SIS's Counterclaim was filed on February 7, 2013. (Doc. # 21.) After being declared moot because SIS filed its Amended Counterclaim (doc. #27), Reynolds renewed this Motion To Dismiss on March 25, 2013 (doc. #29).

SIS's initially filed an Emergency Motion for a Preliminary Injunction on February 25, 2013. (Doc. #24.) After being declared moot because SIS filed its Amended Counterclaim (doc. #27), SIS renewed this Motion on March 5, 2013 (doc. #28).

## RELEVANT LEGAL PROVISIONS

Reynolds seeks dismissal of SIS's Amended Counterclaim pursuant to Fed. R. Civ. P. 8 and 12(b)(6). Pursuant to Rule 8(a)(2) a pleading must contain a "short and plain statement of

---

[4]The VOC file is a computer file that enables the underlying computer operating system to locate executable files and data files.

the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)(quoting Fed. R. Civ. P. 8(a)(2)). This pleading requirement does not require detailed factual allegations but it does require more than an unadorned accusation. *Id.* at 678.

To survive a motion to dismiss, a complaint or counterclaim must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A claim is plausible on its face when the plaintiff pleads factual allegations that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* Finally, while a court must accept all of the factual allegations in a or counterclaim as true, a court need not accept legal conclusions couched as factual allegations as true. *Id.*

Rule 12(b)(6) provides a defense to a claim for relief. Under this Rule, a claim upon which relief cannot be granted may be dismissed.

## ANALYSIS

### Section 1 and 2 of the Sherman Antitrust Act

Reynolds first argues that SIS has not stated a plausible claim under Section 1 or 2 of the Sherman Antitrust Act because SIS has not alleged facts supporting an antitrust injury to a relevant market, because SIS has not alleged facts supporting antitrust standing and because SIS has not alleged facts supporting market power by Reynolds. SIS responds that it has sufficiently alleged an antitrust injury, that it has sufficiently alleged that it is a proper plaintiff in this action and that it has sufficiently alleged facts regarding Reynolds' market power.

### Antitrust Injury To a Relevant Market

Section 1 of the Sherman Antitrust Act prohibits conspiracies to restrain trade. *Static*

*Control Components, Inc. v. Lexmark International, Inc.*, 697 F.3d 387, 401 (6th Cir. 2012).

"Section 2 of the Sherman [Antitrust] Act prohibits the illegal monopolization of a market." *Id*.

Protecting competition is the *sine qua non* of antitrust laws. *Wee Care Child Center, Inc. v. Lumpkin*, 680 F.3d 841, 847 (6th Cir. 2012). "To prove injury, the key inquiry is whether competition - not necessarily a competitor - suffered as a result of the challenged business practice." *Id.* (citing *CBC Companies., Inc. v. Equifax, Inc.*, 561 F.3d 569, 571-72 (6th Cir. 2009)). Thus, showing adverse effects suffered only by an individual competitor does not establish an antitrust injury. *Id.* (citing *Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1014-15 (6th Cir. 2005)). To show antitrust injury, a plaintiff must show not only injury to itself but to a relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

Thus, to allege that an antitrust defendant has injured competition, a plaintiff must first identify the market in which competition has allegedly been injured. *Arnold v. Petland,* No. 2:07-cv-01307, 2009 WL 816327 at *5 (S.D. Ohio Mar. 26, 2009). In this case, SIS alleges that the relevant market is the ERA third-party application aftermarket. SIS further alleges that it is a competitor within that market because it provides integration services to third-party application providers that need to integrate with ERA.

Reynolds first argues that this market is implausible for at least two reasons: (1) SIS addresses none of the factors in the Sixth Circuit's "reasonable interchangeability" standard which requires evaluating geography, product use, quality, description and consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service; and (2) the suggestion of a single-brand Reynolds "aftermarket" ignores the fact that there is substantial

competition in the primary DMS market.

The Sixth Circuit has found the "reasonable interchangeability" standard to be the essential test for determining the relevant product market. *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Association*, 388 F.3d 955, 961 (6th Cir. 2004). The "reasonable interchangeability" standard requires that the relevant product market consists of the tying[5] product and all reasonably interchangeable products. *Shamrock Marketing, Inc. v. Bridgestone Bandag*, LLC, 775 F. Supp.2d 972, 981 (W.D. Ky. 2011). "Reasonable interchangeability" may be determined by (1) the product uses, i.e. whether the substitute products or services can perform the same function, and/or (2) consumer response, i.e. consumer sensitivity to price levels at which they elect substitutes for the defendant's products or services. *Worldwide Basketball,* 388 F.3d at 961.

In this case, SIS's Amended Counterclaim says nothing about whether there are any substitute products or services in the ERA third-party application aftermarket. Also, SIS's Amended Counterclaim says nothing about consumer sensitivity to price levels at which they elect substitutes for Reynolds' products or services. Thus, SIS's has not pled sufficient facts from which the Court may determine whether SIS has identified a satisfactory relevant market.

In addition. SIS's definition of a relevant market is not satisfactory because SIS's definition does not consider whether there is substantial competition in the primary DMS market.

---

[5]The type of violation of Section 1 claimed by SIS in its Amended Counterclaim is called "tying." A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Arnold* , 2009 WL 816327 at *4 (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461 (1992)).

In other words, SIS's definition of the relevant market as the ERA third-party application aftermarket does not consider whether there is substantial competition for DMS products in the first place.

Even if SIS has successfully alleged a relevant market for antitrust purposes, which it has not, SIS has not alleged an antitrust injury. In fact, in its Amended Counterclaim, SIS acknowledges that any third-party application provider that wishes to do so can choose to either have Reynolds integrate their product or become certified by Reynolds to install their own product.

SIS says little about the amount of fees Reynolds' charges to become certified other than the vague statement that these fees are "exorbitant." Further, SIS does not provide supporting facts for its conclusory assertion that Reynolds is limiting the options of the dealers and preventing them from choosing the best available services. Finally, SIS's Amended Counterclaim does not identify any third-party application provider that has been forced out of the ERA third-party application provider aftermarket.

SIS argues that it has sufficiently alleged that Reynolds' anti-competitive actions have harmed not only SIS, but also competition within the relevant market. Assuming that SIS has defined a "relevant market" for antitrust purposes, this argument is not supported by SIS's Amended Counterclaim.

SIS argues that it is a competitor in the relevant market in that it provides integration services to third-party application providers. However, SIS has not defined the relevant market as integration services and SIS has not pled that it is a third-party application provider. Thus, SIS is not a competitor in the relevant market defined in its Amended Counterclaim.

Finally, while SIS has alleged that Reynolds' anti-competitive actions have harmed competition within the relevant market, SIS has provided no substantive factual allegations in support of this assertion. SIS's Amended Counterclaim includes no factual allegations of specific third-party application providers that have been harmed by Reynolds' alleged anti-competitive actions.

SIS's Amended Counterclaim fails to plausibly allege a "relevant market" or an antitrust injury. Thus, SIS's antitrust counterclaims are dismissed for this reason alone. But, there is more.

### Antitrust Standing

Private parties, such as SIS, may bring an action for violations of Section 1 or Section 2 of the Sherman Antitrust Act. *Static Control,* 697 F.3d at 401. However, to bring a claim, a private party must demonstrate that it has standing. *Id.* at 402.

Standing in an antitrust case is more onerous than the conventional Article III standing. *Id.* As with Article III standing, when a court finds at the pleading stage that the plaintiff does not have antitrust standing, the complaint or counterclaim is dismissed as a matter of law. *Id.*

Antitrust standing is generally determined by balancing five factors: (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as a consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. *Id.* (citing *Southhaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).

One of the purposes of antitrust standing is to ensure that the antitrust plaintiffs allege injuries on market competition and not on individual competitors. *Shamrock Marketing*, 775 F. Supp.2d at 978 (citing *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989)). However, claimants who are not direct players in the relevant market may have standing if their injury is "inextricably intertwined" with the injury sought to be inflicted. *Static Control,* 697 F.3d at 404. Yet, the "inextricably intertwined" exception is narrow. *Id.* This exception was not designed to give standing to claimants whose injuries are a tangential byproduct of monopolistic conduct in a related market. *Id.* To satisfy this exception, the plaintiff must show that the defendants "manipulated or utilized [the plaintiff] as a "fulcrum, conduit or market force" to injure competitors in the relevant product and geographic markets. *Id.*

In this case, SIS's Amended Counterclaim indicates that SIS is not a competitor or consumer in the relevant market that SIS has defined. SIS indicates that it is a third-party application integrator, not a third-party application provider. Finally, SIS's Amended Counterclaim does not directly address all of the five factors the Court is to consider.

Therefore, because SIS is not a direct player in the relevant market defined by SIS, SIS's standing to bring its antitrust counterclaims turns on whether the "inextricably intertwined" exception applies. However, SIS has not made sufficient factual allegations in its Amended Counterclaim to indicate that Reynolds manipulated or used SIS as a "fulcrum, conduit or market force" to injure competitors in the relevant product market.

There would be more direct victims of Reynolds alleged antitrust activity than SIS who presumably have standing to sue Reynolds and they are not present in this case. Thus, if the Court were to find that SIS's conclusory allegations that Reynolds is "limiting the options of

dealers" or "monopolizing" the Reynolds-brand DMS application aftermarkets were true, SIS's antitrust counterclaims would still be dismissed because the proper plaintiffs would be the dealers or the third-party application providers who are alleged to be direct victims.

In sum, SIS has not plausibly pled that it has standing to sue Reynolds for the alleged antitrust violations. SIS's antitrust claims may be dismissed for this reason alone. But, there is more.

**Reynolds' Market Power**

SIS brings a "tying" counterclaim under Section 1 and a "monopolization" claim under Section 2. Both require SIS to plead that Reynolds has market power.

Section 1 Counterclaim

A party, such as SIS here, making a claim of illegal "tying" must show that; (1) the seller has appreciable economic power in the tying product market: (2) the tying arrangement affects a substantial volume of commerce in the tied market; (3) the seller has a direct economic interest in the sale of the tied product; and (4) the party has suffered antitrust injury as a result of the tying arrangement. *Shamrock Marketing,* 775 F. Supp.2d at 980 (citing *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 F. App'x 831, 834 (6th Cir. 2004)).

Thus, an antitrust party must show that the seller has sufficient market power to force the tying of other products to the purchase of the tying product. *Arnold*, 2009 WL 816327 at *7. The seller must have some special ability, usually called market power, to force a purchaser to do something that the purchaser would not do in a competitive market. *Id.*

The existence of market power is ordinarily inferred from the seller's possession of a predominant share of the market. *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811,

817-18 (6th Cir. 1997) (a thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power). However, there can be no market power that arises solely from contractual rights that consumers knowingly and voluntarily give to the defendant. *In re Apple & AT & TM Antitrust Litigation*, 596 F. Supp.2d 1288, 1305 (N.D. Cal. 2008).

In this case, although SIS's Amended Counterclaim identifies an alleged relevant market, it does not specifically identify the tied product and the tying product. The relevant market, according to SIS, is the aftermarket of third-party applications designed to integrate with Reynolds ERA at auto dealerships. SIS goes on to argue that Reynolds is using its market power to restrain this aftermarket. Giving SIS the benefit of the doubt, the Court will assume that the tying product is Reynolds' ERA and the tied product is third-party applications.

SIS has not pled that Reynolds has market power in this market. First, regarding the tying product, the auto dealers have a choice as to which, if any, DMS they use. The closest SIS's Amended Counterclaim gets to discussing Reynolds' market power regarding the tying product is to allege that approximately 40% of the auto dealers that the third-party application providers that are SIS's customers work with use Reynolds' ERA. SIS's Amended Counterclaim also alleges that Reynolds occupies "a large percentage of the market" for DMS "throughout the country." Thus, SIS has not plausibly pled facts showing that Reynolds has appreciable economic power in the tying product market.

Second, regarding the tied product, SIS has not pled that Reynolds has a direct economic interest in the third-party applications. Even if the Court were to assume that the tied product was integration of the third-party applications, Reynolds does not require that the auto dealers

use Reynolds to do this integration. In addition to performing integration itself, Reynolds licenses others to do so. SIS's allegation that Reynolds charges an "exorbitant fee" to license others does not satisfy the plausibility requirement.

In sum, SIS has not plausibly identified a tying product or tied product. Even if reasonable assumptions are made regarding what are the tying and tied products, SIS has not plausibly pled that Reynolds has appreciable economic power in the product market or that Reynolds has a direct economic interest in the tied product.

### Section 2 Counterclaim

A claim under Section 2 requires a plausible pleading of (1) possession of monopoly power in the relevant market and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *State Control*, 697 F.3d at 402. Thus, SIS must plausibly plead that Reynolds possessed monopoly power in the alleged relevant market of the aftermarket of third-party applications that can integrate with Reynolds' ERA.

As more fully discussed above, SIS has not plausibly pled that Reynolds has monopoly power in SIS's alleged relevant market. SIS's pleading indicates that there are many participants, other than Reynolds, in that relevant market.

SIS cites *In re Apple*, 596 F. Supp.2d 1288, as support for its argument that it has successfully alleged a relevant market and that the aftermarket of third-party applications that can integrate with Reynolds' ERA is wholly dependent upon a primary market that is restrained by Reynolds. However, this support is misguided for at least two reasons. First, in the case cited, there were undisclosed terms which the purchasers were not aware of when the phones were

purchased. That is not the case here. SIS has not pled that Reynolds changed the terms of its agreements with ERA purchasers after ERA was purchased. Second, the primary market here is not restrained by Reynolds. DMS users can contract for DMS from whomever they choose, Reynolds ERA being one of the options.

## Conclusion

In sum, SIS has not plausibly pled that Reynolds violated either Section 1 or Section 2 of the Sherman Antitrust Act. Those two Counterclaims must be dismissed.

## The CFAA

SIS asserts that Reynolds is violating the CFAA by interfering with the interface between ERA and SIS's integration software located on the computers owned by the auto dealerships. SIS also asserts that this conduct is not authorized by the auto dealers.

The CFAA creates liability for accessing a protected computer without authorization or exceeding authorized access." *In re iPhone Application Litigation*, 844 F. Supp.2d 1040, 1064 (N.D. Cal. 2012). The CFAA is primarily a criminal statute, and authorizes a civil action only for certain enumerated conduct. *Id.* at 1065.

> To bring a civil action, a plaintiff must show that one of the following applies:
>
> (I) loss to one or more persons during any one-year period aggregating at least $5,000 in value;
>
> (II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals;
>
> (III) physical injury to any person;
>
> (IV) a threat to public health or safety; or
>
> (V) damage affecting a computer used by or for an entity of the U. S. Government in furtherance of the administration of justice, national defense or national

security.

*Id.* "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

In this case, SIS asserts that it is alleging a violation of 18 U.S.C. § 1030(a)(5)(a). However, 18 U.S.C. § 1030(g) does not authorize SIS to bring a civil action pursuant to 18 U.S.C. § 1030(a)(5)(a). Further, if SIS's Amended Counterclaim were to be considered to be a civil action brought pursuant to 18 U.S.C. § 1030, SIS has not plausibly pled any of the necessary elements.

Therefore, SIS has not plausibly pled that Reynolds violated the CFAA or that SIS is entitled to civil relief. This Counterclaim must be dismissed.

## Tortious Interference With Contract

SIS alleges that Reynolds interfered with SIS's contractual relationships with third-party application providers. Reynolds interfered, according to SIS, by interfering with SIS's integration software, blocking the third-party application providers's access to the data on ERA and notifying auto dealers that their data security would be compromised if the auto dealers permitted SIS to institute and manage automated access.

Under Ohio law, a cause of action for tortious interference with contract occurs when "…one who, without a privilege to do so, induces or otherwise purposely causes a third party not

to enter into, or continue, a business relationship with another, or perform a contract with another." *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1138 (6th Cir. 1995) (citing *Smith v. Klein*, 492 N.E.2d 852 (Ohio Ct. App. 1985)). The elements of tortious interference with contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Insurance Co.*, 650 N.E.2d 863, 866 (Ohio 1995). Regarding privilege or justification, "one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract." *Wright*, 58 F.3d at 1139 (citing *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988)).

SIS's Amended Counterclaim does not plausibly plead all of these elements. For example, SIS pleads that certain contracts exist but does not identify specifically who the contract may be with or identify any of the terms of these alleged contracts. Also, SIS does not plead how these contracts have been breached and does not plead damages in the form of which of the alleged contracts were lost. Finally, SIS does not plead that Reynolds lacked justification to intentionally interfere. Because SIS's Amended Counterclaim does not plausibly plead a tortious interference with contract claim, it must be dismissed.

## SUMMARY

SIS's Amended Counterclaim does not contain sufficient factual allegations, accepted as true, to state a claim to relief that is plausible on its face. In addition, civil relief cannot be granted on SIS's Counterclaim for violation of the CFAA. Therefore, Reynolds' Motion To

Dismiss (doc. #29) is GRANTED. SIS's Amended Counterclaim is DISMISSED.

At the end of its Response, SIS asserts that if its Amended Counterclaim requires more factual detail, SIS should be granted leave to amend. At this time, the Court, not having seen any proposed revised or new counterclaims, will not grant leave to amend. However, SIS may file a motion to file an amended counterclaim if it wishes. If made, the Court will consider the motion and any objections thereto.

Finally, SIS has sought an Emergency Preliminary Injunction on its Amended Counterclaim. The dismissal of SIS's Amended Counterclaim renders SIS's Emergency Motion for Preliminary Injunction (doc. #28) moot. Finally, the hearing date for the Preliminary Injunction hearing previously set is vacated.

**DONE** and **ORDERED** in Dayton, Ohio this Sixth Day of June, 2013.

                                                  s/Thomas M. Rose

                                        _____
                                          THOMAS M. ROSE
                                        UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record